UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
|   Plaintiff, | § | |
| | § | |
| v. | § | CRIMINAL NO. 6:19-30 |
| | § | |
| MERCEDES GALVAN & | § | |
| ILSE IVON SOLIS, | § | |
|   Defendants. | § | |

**MEMORANDUM OPINION & ORDER**

Defendants Mercedes Galvan and Ilse Ivon Solis are charged with conspiracy to possess with intent to distribute methamphetamine. Now pending are Defendants' motions to suppress (D.E. 40, 43), to which the Government filed a consolidated response (D.E. 51). An evidentiary hearing was held (1/22/20 Hrg. Tr., D.E.56), after which Defendants filed a joint supplemental memorandum (D.E. 58).

**I. Factual Background**

Fayette County Sheriff's Deputy Randy Thumann testified that on June 15, 2018, Galvan was the driver of a Saturn Vue owned by Solis in which Solis and her three minor children were passengers. The vehicle was traveling east on Interstate 10 just outside of Flatonia, Texas, when Sgt. Thumann noticed unrestrained children in the back seat. He also noted that the vehicle was an older model with a newer registration, which he found suspicious based on the large percentage of newly-registered older cars he had previously stopped that were found to be transporting narcotics. He ran the vehicle's license plate and discovered that it had entered the United States earlier that morning from Mexico, a known source area for narcotics.

The dashcam video of the stop showed that Sgt. Thumann initiated a traffic stop on the vehicle at 11:05 A.M. In under a minute, he informed Defendants of the reason for the stop, asked

for identification and proof of insurance, and asked them about their travel plans. Both responded that they were travelling from Laredo to Houston for the weekend. Because Sgt. Thumann already knew that the vehicle had entered the U.S. from Mexico earlier that morning, he asked if they were coming from Mexico or Laredo. Both responded that they were coming from Laredo and had not been to Mexico.

At 11:07 A.M., Sgt. Thumann returned to his police cruiser and ran checks on Defendants with dispatch. Both came back negative. At 11:09 A.M., Sgt. Thumann returned to the vehicle and asked to speak with Galvan alone, and she walked to the rear of the car. When asked where they planned to stay in Houston, Galvan stated they were going to stay in a hotel but hadn't booked one yet. She also responded for a second time that they were coming from Laredo, not Mexico. When asked if anyone else had control over the car, Galvan said no, only she and Solis. During this conversation, Sgt. Thumann asked more than once whether there was contraband in the car, and each time Galvan responded no. At 11:11 A.M., Sgt. Thumann asked Galvan for permission to search the car, and she consented.

Sgt. Thumann then walked to the passenger side of the vehicle to speak with Solis. In response to his questions, Solis stated that they planned to visit "the Boardwalk" in Houston and would get a hotel room when they arrived. She further stated that they were coming from Laredo, not Mexico. When asked whether anyone else had the car, Solis stated that the car had been at a shop for a couple of days. When asked whether there was anything illegal in the car, Solis responded no. At 11:12 A.M., Solis granted Sgt. Thumann's request for permission to search the car and asked if she needed to get her kids out.

Because of the dangers of being on the side of I-10, Sgt. Thumann asked Defendants if they would like to drive the car to the next exit to get off the road. Galvan responded yes and

followed him to a nearby gas station. At 11:21 A.M., Sgt. Thumann began searching the car with his K-9 unit, Lobos. One minute later, K-9 Lobos alerted to narcotics in the vehicle. At 11:25 A.M., Sgt. Thumann found narcotics in the vehicle's gas tank.

Roughly an hour later, officers towed the vehicle to the Fayette County Sheriff's Office, where deputies retrieved approximately 21 kilograms of methamphetamine from the car's gas tank. Defendants made various statements at this time. The Government later obtained photos of Defendants crossing the U.S.–Mexico border in Solis' Saturn Vue on the morning in question.

## II. Defendants' Motions to Suppress

Defendants move to suppress evidence of the methamphetamine and any statements they made on the grounds that: (1) Sgt. Thumann unlawfully prolonged the stop by asking questions unrelated to any traffic violation, and (2) their consent was invalid because it was given during the period of unlawful detention.

## III. Legal Standard

Routine traffic stops, being closer in nature to investigatory detentions rather than a full blown arrest, are governed by the principles set out in *Terry v. Ohio*, 392 U.S. 1 (1968). *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). The legality of a police investigatory stop under *Terry* is assessed in two parts: (1) whether the officer's action was justified at its inception, and (2) whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. *Terry*, 392 U.S. at 19–20; *Brigham*, 382 F.3d at 506.

During the stop, the officer may examine driver's licenses and vehicle registrations and run computer checks as part of the investigation of the circumstances that originally caused the traffic stop. *United States v. Pack*, 612 F.3d 341, 350 (5th Cir.), *opinion modified on denial of reh'g*, 622

F.3d 383 (5th Cir. 2010). The officer may also ask about the purpose and itinerary of the occupant's trip as part of this investigation. *Id.* An officer may ask questions on subjects unrelated to the circumstances that caused the stop, so long as the unrelated questions do not extend the duration of the stop. *Id.* However, once an officer's initial suspicions "have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006). The Supreme Court has further held that, absent reasonable suspicion, police may not extend an otherwise-completed traffic stop, in which a ticket or warning has been issued, in order to conduct an unrelated search. *Rodriguez v. United States*, — U.S. —, 135 S.Ct. 1609, 1616 (2015) (dog sniff performed after officer issued written warning for traffic violation held unlawful).

## IV. Analysis

Defendants concede that the traffic stop was justified at its inception but complain that, before Sgt. Thumann asked for consent to search, he failed to diligently investigate the reason for the stop. Instead, he detained them beyond the time needed to investigate the circumstances that caused the stop and in a manner that did not utilize the diligence required by *Terry*. Galvan further claims that she was seized when she was physically ordered outside the car and told to wait there so that Sgt. Thumann could separately question Defendants about their travel plans in order to determine if there were any inconsistencies in their stories.

The Government maintains that Sgt. Thumann was free to inquire about the purpose and itinerary of Defendants' trip without unlawfully extending the stop because the Fifth Circuit "consider[s] these questions to be reasonably related in scope to his investigation of the circumstances that caused the stop." *Pack*, 612 F.3d at 350. According to the Government, Sgt. Thumann already suspected Defendants may be transporting narcotics because the vehicle was a

4

newly-registered older model that had come from Mexico earlier that morning. Then, while questioning Defendants before he ran the check with dispatch, Sgt. Thumann developed additional reasonable suspicion of illegal activity because Defendants denied that they were coming from Mexico and claimed that they were going to spend the weekend in Houston with three children, but hadn't previously booked a hotel room. *See United States v. Berry*, 664 F. App'x 413, 419 (5th Cir. 2016), *as revised* (Dec. 14, 2016) ("[I]nconsistent and untruthful statements can be a factor in developing reasonable suspicion during a traffic stop . . . .").

Defendants argue that none of these factors is sufficient to "push suspicion across the line into 'reasonable suspicion,'" citing *United States v. Madrigal*, 626 Fed. App'x 448, 452 (5th Cir. 2015). In *Madrigal*—a case with facts quite similar to this one, including the same arresting officer—Sgt. Thumann performed a traffic stop on a newly-registered, older vehicle heading towards Houston from Mexico; extended the stop with additional questions after finishing the computer check; obtained Madrigal's consent to search; and eventually discovered methamphetamine in the vehicle's gas tank. In reversing the district court's denial of a motion to suppress, the Fifth Circuit concluded that: "[d]riving an older, recently registered vehicle may be slightly suspicious, but it is minimal;" "[b]ecause Mexico and Houston are each home to millions of lawful people, neither [city] can support a great inference of criminal activity;" and Madrigal was "not out-of-the-ordinary in his decision to travel from Mexico to Houston and back in a day," especially for a person of limited means. *Id.* at 451 & n.21. The Government counters that *Madrigal* is distinguishable because, unlike Defendants here, Madrigal did not falsely deny that he was coming from Mexico. The Court agrees.

In *Pack*, the Fifth Circuit "note[d] that under Texas law it is a crime to, with intent to deceive, knowingly make a material, false statement to an investigating officer." *Pack*, 612 F.3d

5

at 360.[1] Because "a traffic stop is a criminal investigation," and "making a material, false statement during the investigation of a traffic stop is itself a crime under Texas law," the court reasoned that "it is hard to argue that an officer would not have reasonable suspicion of criminal activity when confronted with a statement reasonably viewed as false and material to his investigation of a traffic violation." *Id.* (citing *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001)). Defendants argue that because Sgt. Thumann did not know for a fact that they were in Solis' Saturn when it crossed the Mexican border until much later—when photographs taken at the border confirmed his hunch— he did not have reasonable suspicion of criminal activity at the time he questioned Defendants and obtained consent. Under *Pack*, however, it is sufficient that Sgt. Thumann "reasonably viewed" Defendants' statements that they were not coming from Mexico as false.

Based on the evidence presented, the Court finds Sgt. Thumann had developed reasonable suspicion to justify extending the stop to investigate additional criminal activity after the dispatch checks came back clean. *See, e.g.*, *Berry*, 664 F. App'x at 419 (reasonable suspicion to extend stop where trooper believed motorist lied during traffic stop); *Pack*, 612 F.3d at 358–61 (reasonable suspicion created by defendant's conflicting story and the fact that he was traveling along a drug trafficking corridor); *United States v. Estrada*, 459 F.3d 627, 632 (5th Cir. 2006) ("the totality of the circumstances, including the fact that the vehicle had recently crossed from Mexico, 'a

---

1. The Texas Penal Code provides that:

   (a) A person commits an offense if, with intent to deceive, he knowingly makes a false statement that is material to a criminal investigation and makes the statement to:
       (1) a peace officer conducting the investigation; or
       (2) any employee of a law enforcement agency that is authorized by the agency to conduct the investigation and that the actor knows is conducting the investigation.
       \* \* \*
   (c) An offense under this section is a Class B misdemeanor.

TEX. PEN.CODE ANN. § 37.08.

common origin of illicit drugs,'" suggested there was a reasonable likelihood defendant was transporting drugs) (quoting United *States v. Jurado–Vallejo*, 380 F.3d 1235, 1238–39 (10th Cir. 2004)); *United States v. Garza*, 2009 WL 10680036, at *4 (W.D. Tex. Nov. 19, 2009), *aff'd*, 452 F. App'x 510 (5th Cir. 2011) (reasonable suspicion of narcotics trafficking warranted further detention and questioning where defendant, among other things, "responded suspiciously to the officers' questions"). Within eight minutes after initiating the stop and three minutes after the dispatch checks came back, Sgt. Thumann conducted this colloquy and received consent from both women to search the vehicle. The detention was therefore not longer than necessary to investigate the circumstances justifying the stop. Finally, Defendants' consent, which was given while they were lawfully detained and not challenged on any other grounds, was valid.[2]

**V. Conclusion**

For the foregoing reasons, Defendants' motions to suppress (D.E. 40, 43) are **DENIED**.

It is so **ORDERED** this 6th day of April, 2020.

_____
JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE

---

2. In their joint post-hearing brief, Defendants argue that consent was involuntary and illegally coerced, and that the Government failed to produce evidence to the contrary. Defendants are correct that if a challenge is made to the voluntariness of consent to search, the Government must prove voluntariness by a preponderance of the evidence. *United States v. Arias-Robles*, 477 F.3d 245, 248 (5th Cir. 2007); *United States v. Santiago*, 410 F.3d 193 (5th Cir. 2005). However, Solis' motion to suppress did not challenge the validity of consent at all, and Galvan's motion challenged her consent only to the extent that it was given while she was unlawfully detained.

7